Bradford L. Geyer
**FormerFedsGroup.Com**
141 I Route 130 South, Suite 303
Cinnaminson, NJ 08007
Telephone: (888) 486-3337
Email: brad@formerfedsgroup.com

Robert E. Barnes
Lexis Anderson
**Barnes Law, LLP**
700 S. Flower Street, Suite 1000
Los Angeles, CA 90017
Telephone: (310) 510-6211
Email: robertbarnes@barneslawllp.com
Email: lexisanderson@barneslawllp.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| STEPHANIE MARRA, an individual; DONNA HOLLAND, an individual; TEOFESTA PUSILLO, an individual; LOURDES GARCIA, an individual; and KYLE NICHOLSON, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> MADISON SQUARE GARDEN ENTERTAINMENT CORP. and RADIO CITY PRODUCTIONS, LLC, <br><br> Defendants. | Case No.: <br><br><br> Civil Action <br><br> **COMPLAINT** |

Plaintiffs STEPHANIE MARRA, residing at 57 Myrtle Drive, Manahawkin, NJ,

DONNA HOLLAND, residing at 41 Beecher Street, Newark, NJ, TEOFESTA PUSILLO,

residing at 70 2nd Ave, Port Reading, NJ, LOURDES GARCIA, residing at 15 Jefferson Street,

Belleville, NJ 07109, and KYLE NICHOLSON, residing at 44 Stockton Drive, Marlboro, NJ

07746, allege the following against Defendants MADISON SQUARE GARDEN

ENTERTAINMENT CORP., headquartered at 2 Penn Plaza, New York, NY 10121-0038, and

RADIO CITY PRODUCTIONS, LLC, holding its principal place of business at 1260 Sixth Ave,

New York, NY, 10020.

## INTRODUCTION

1.       Plaintiffs Stephanie Marra, Donna Holland, Teofesta Pusillo, Lourdes Garcia, and

Kyle Nicholson seek relief from Defendants' pattern of discriminatory and illegal

behavior in violation of Title VII of the Civil Rights Act of 1968 and the Americans with

Disabilities Act against employees who hold sincere religious and medical objections to

Madison Square Garden Entertainment's COVID-19 vaccination mandate policy.

2.        In May 2021, Madison Square Garden Entertainment, and its subsidiary Radio

City Productions, LLC, imposed an unnecessary, draconian vaccine mandate for all

employees that addresses a very remote risk: asymptomatic spread of COVID-19 to

fellow employees, by a method (vaccination) that poses a higher risk of deadly spread of

COVID-19 than asymptomatic spread.

3.        Defendants refused to accept and accommodate Plaintiffs' sincere religious and

medical objections to the vaccine.

4.        Defendant's unlawful actions left Plaintiffs with the impossible choice of

suffering a physical assault and uninvited invasion of their bodies by receiving the

experimental and harmful mRNA COVID-19 vaccine, at the expense of their religious

beliefs, bodily autonomy, medical privacy, and possibly health, or losing their

livelihood.

5.        This Faustian bargain is no bargain at all and is precisely what is forbidden by

federal and Pennsylvania civil rights law.

6.    Defendants' actions violated the law by mandating an experimental medical treatment, failing to provide reasonable accommodations for exemptions, and violating the sacred rights of privacy and bodily integrity.

7.    Plaintiffs respectfully implore this Court to order that Defendants comply with the laws protecting the citizens against precisely such Catch-22 "choices."

**PARTIES**

8.    Plaintiff Stephanie Marra ("Marra") was employed as a wardrobe dresser by Radio City Productions, LLC and Madison Square Garden Entertainment. She was terminated from her employment due to Defendants' COVID-19 vaccine mandate. Marra resides in Manahawkin, New Jersey.

9.    Plaintiff Donna Holland ("Holland") was employed as a wardrobe dresser by Radio City Productions, LLC and Madison Square Garden Entertainment. She was terminated from her employment due to Defendants' COVID-19 vaccine mandate. She resides in Newark, New Jersey.

10.    Plaintiff Teofesta Pusillo ("Pusillo") was employed as a wardrobe dresser by Radio City Productions, LLC and Madison Square Garden Entertainment. She was terminated from her employment due to Defendants' COVID-19 vaccine mandate. She resides in Port Reading, NJ.

11.    Plaintiff Lourdes Garcia ("Garcia") was employed as a wardrobe dresser by Radio City Productions, LLC and Madison Square Garden Entertainment. She was terminated from her employment due to Defendants' COVID-19 vaccine mandate. She resides in Belleville, NJ.

12.     Plaintiff Kyle Nicholson ("Nicholson") was employed as a Stagehand by Radio City Productions, LLC and Madison Square Garden Entertainment. He was terminated from his employment due to Defendants' COVID-19 vaccine mandate. He resides in Marlboro, NJ.

13.     Defendant Madison Square Garden Entertainment Corp. ("MSG") is a leading entertainment and media company that owns and operates venues in a variety of cities. MSG owns and operates Radio City Music Hall, where Radio City Productions, LLC operates. MSG is headquartered at 2 Penn Plaza, New York, NY 10121-0038.

14.     Defendant Radio City Productions, LLC ("Radio City") is a subsidiary of and owned-and-operated by MSG. Radio City oversees productions held at the Radio City Music Hall in New York City. Radio City is incorporated in Delaware and holds its principal place of business at 1260 Sixth Ave, New York, NY, 10020.

## JURISDICTION AND VENUE

15.     This Court has original jurisdiction over the subject matter of this dispute pursuant to 28 United States Code ("U.S.C.") § 1331. Plaintiffs seek remedies under Title VII of the Civil Rights Act pursuant to 42 U.S.C. §§ 2000e et seq. and Title III of the Americans with Disabilities Act under 42 U.S.C. §§ 12181, et seq.

16.     Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this judicial district.

## FACTS AND BACKGROUND

**Madison Square Garden's Unlawful COVID-19 Vaccine Mandate**

17.     Because of COVID-19, MSG and Radio City halted production in the spring of 2020 and told employees to remain at home.

18.     On May 26, 2021, MSG announced that employees could return to in-person work on the condition they become fully vaccinated for COVID-19.

19.     On May 26, 2021, Madison Square Garden Entertainment ("MSG") implemented a requirement that "all employees and contingent workers entering any of the Company's work locations or venues or the work locations of affiliates Madison Square Garden Sports Corp. ("MSG Sports") or MSGN Holdings, L.P. ("MSG Networks"), must be fully vaccinated against COVID-19." *See* Exhibit A.

20.     According to the policy, "[t]o be considered 'fully vaccinated,' either two weeks must have elapsed following an individual's receipt of the second dose of a two-dose vaccine series, or two weeks must have elapsed following an individual's receipt of a single-dose vaccination." *See* Exhibit A.

21.     Madison Square Garden Entertainment requires that all employees must have received either the only dose of a single-dose vaccination or at least the first dose of a two-dose vaccination series by July 12, 2021. All employees were required to be fully vaccinated by August 21, 2021.

22.     MSG stated that it would review all requests for reasonable accommodations due to a medical condition, disability, or sincerely held religious belief.

23.     MSG implemented unreasonably heightened requirements for seeking a religious exemption, namely requiring documentation from a religious official, which precluded some individuals from even seeking an exemption.

24.     The policy stated that employees who do not adhere to this requirement and are not granted an accommodation will be terminated and will not be eligible for severance pay.

25.     MSG disparately applied their mandate and made exceptions for certain groups of people. The New York Rangers, who are also owned by MSG via Madison Square Garden Sports, were afforded a different set of rules regarding MSG's vaccination mandate. The team was considered fully vaccinated at 85%. This allowed an automatic exemption for players to objected to the forced vaccination policy. Entertainment workers, such as Plaintiffs, were not given the same option but were instead threatened and harassed.

**MSG's Discriminatory Treatment of Plaintiff Stephanie Marra**

26.     Plaintiff Stephanie Marra was employed as a wardrobe dresser by MSG and Radio City.

27.     Marra had worked for MSG-owned Radio City since 2012 under a collective bargaining agreement negotiated between Radio City Productions and IATSE Theatrical Wardrobe Union, Local 764.

28.     Marra applied for an exemption and accommodation from MSG's COVID-19 vaccine mandate on both religious and medical grounds.

29.     Marra had sincere religious objections that prevented her from receiving a COVID-19 vaccine.

30.     On July 9, 2021, David Pomales, an employee relations manager at MSG, required that Marra submit additional information regarding her medical-related accommodation request, including: 1) information about the specific accommodation

Marra was requesting; 2) sign forms (e.g., HIPAA release) that enabled Met Life to review her request and discuss details with Marra's medical provider; 3) provide any necessary supporting documentation such as a doctor's note. MSG required Marra to provide this information by July 12, 2021.

31.     On May 31, 2021, Marra wrote a letter to Matthew Loeb expressing her concern about the forced vaccination of Radio City employees and requesting replies to several questions regarding the legality and liability of the mandate. *See* Exhibit B. Her concerns were never addressed.

32.     On July 22, 2021, MSG denied Marra's accommodation request on the grounds that 1) the documentation provided by Marra was inadequate and 2) an accommodation would pose a direct threat to her fellow employees and an undue burden on MSG.

33.     On July 23, 2021, Marra was subsequently denied access to MSG's systems, including her email and pay slips. She was informed that she had been terminated.

34.     Marra was an exemplary employee. She satisfied every requirement necessary to obtain an exemption and accommodation from MSG's mandate and made numerous efforts to communicate with her supervisors to find a solution – to no avail.

35.     Marra filed a complaint with the New York State Division of Human Rights (NYSDHR) on April 18, 2022 alleging discrimination on the basis of religion and a perceived disability.

36.     Marra's complaint was administratively dismissed by the NYSDHR on August 11, 2022.

37.        The United States Equal Employment Opportunity Commission ("EEOC") issued

a Notice of Right to Sue to Marra on December 13, 2022. See Exhibit C. This Complaint

has followed.

**MSG's Discriminatory Treatment of Plaintiff Donna Holland**

38.        Plaintiff Donna Holland was employed as a wardrobe dresser by Madison Square

Garden Entertainment and Radio City Productions.

39.        Holland had worked for MSG-owned Radio City Productions since 2012 under a

collective bargaining agreement negotiated between Radio City Productions and IATSE

Theatrical Wardrobe Union, Local 764.

40.        Holland was employed with MSG as a Wardrobe Dresser at Radio City Music

Hall.

41.        Holland was an exemplary employee.

42.        Holland had sincere religious objections that prevented her from receiving a

COVID-19 vaccine. She also had a medical condition that put her at risk from adverse

effects caused by the COVID-19 vaccine.

43.        Holland applied for an exemption and accommodation from MSG's COVID-19

vaccine mandate on both religious and medical grounds.

44.        Along with her exemption requests, Holland provided both a letter from her

physician attesting to her inability to take the vaccine and a letter from a religious leader

attesting to her sincere religious objections to the vaccine.

45.        Holland's religious exemption and accommodation requests was denied on the

grounds that granting her request would pose a direct threat to other employees and an

undue hardship.

46.     Holland's medical exemption request was denied on the grounds that she provided inadequate documentation, even though Holland provided ample evidence and complied with every request made by Defendants.

47.     On July 11, 2021, after Holland submitted her medical exemption request, Azure-Dee Martin, the Senior Director of Human Resources at MSG, emailed Holland stating that she had failed to provide documentation that supports her request and/or had failed to submit the required form releasing her medical information.

48.     Specifically, Martin requested that Holland provide 1) information about the specific accommodation she was requesting; 2) a HIPPA release form allowing Met Life, a third-party provider, to review her medical exemption request and discuss private medical information with Holland's provider, and 3) any supporting documentation, such as a doctor's note, stating why Holland was unable to obtain the vaccine.

49.     Martin instructed her to submit this documentation by July 12, 2021 at 12:00 p.m. EST; if she did not do so, her request would be void.

50.     Holland replied to Martin with the requested signed HIPPA release form and a formal note from her physician stating why she was unable to receive the COVID-29 vaccine. In the email, Holland also articulated that she was requesting mask wearing as a reasonable accommodation. Holland clarified that this documentation had already been submitted previously.

51.     MSG acknowledged in their return communication that Holland had completed all sets needed to seek an exemption.

52.     However, MSG closed her claim and continued to withhold her exemption, claiming that MetLife had been unable to obtain the necessary documentation from Holland's physician.

53.     Holland's physician informed her that, weeks after Holland's initial of her release form, MetLife had never contacted his office, nor had it followed the requisite protocol to obtain this information.

54.     Although Holland had already submitted all requested information, MSG offered Holland another opportunity to supply the documentation, but only gave her two days to do so.

55.     Holland and her counsel at the time repeatedly attempted to contact MSG regarding the issue but were unable to speak with the representative who had been handling Holland's case.

56.     Holland informed MSG that her doctor had confirmed that his office had contacted MetLife and provided the necessary information.

57.     Despite this, MSG continued to insist that the requisite information had never been provided.

58.     Holland made numerous attempts to resolve this issue with MSG supervisors but was continuously met with resistance and silence.

59.     MSG denied Holland's exemption request on October 15, 2021 and was officially terminated.

60.     Holland lost not only her wages, but ample benefits including health insurance, annuity contributions, pension contributions, vacation payouts, and unused sick day payouts.

61.     Holland filed a complaint with the NYSDHR on April 18, 2022 alleging discrimination on the basis of religion and a perceived disability.

62.     Holland's complaint was administratively dismissed by the NYSDHR on September 21, 2022.

63.     Holland received her Notice of Right to Sue from the EEOC on November 22, 2022. *See* Exhibit D. This Complaint has followed.

**MSG's Discriminatory Treatment of Plaintiff Teofesta Pusillo**

64.     Plaintiff Teofesta Pusillo was employed as a wardrobe dresser by Madison Square Garden Entertainment and Radio City Productions.

65.     Pusillo worked for MSG-owned Radio City Productions under a collective bargaining agreement negotiated between Radio City Productions and IATSE Theatrical Wardrobe Union, Local 764.

66.     Pusillo held sincere religious objections to the COVID-19 vaccine that prevented her from complying with MSG's mandate.

67.     Pusillo submitted a religious exemption and accommodation request on the grounds that receiving the COVID-19 vaccine violated her conscience and sincere religious beliefs.

68.     Along with her request, she submitted a detailed explanation of her objections to receiving the vaccine well ahead of the deadline to become fully vaccinated.

69.     MSG denied Pusillo's exemption on July 22, 2021 on the grounds that Pusillo had failed to establish that she was qualified for an accommodation and that the accommodation would pose a direct threat and undue hardship.

11

70.    MSG failed to engage in any interactive process with Pusillo and to perform an individualized assessment to accommodate her situation.

71.    After her exemption was denied, Pusillo refused to comply with the vaccine mandate and, as a result, was terminated on July 23, 2021.

72.    Pusillo repeatedly informed MSG that she was not voluntarily resigning.

73.    Pusillo lost not only her wages, but ample benefits including health insurance, annuity contributions, pension contributions, vacation payouts, and unused sick day payouts.

74.    Pusillo filed a complaint with the NYSDHR alleging discrimination based on religion and a perceived disability.

75.    Pusillo's complaint was administratively dismissed by the NYSDHR on November 8, 2022.

76.    The EEOC issued a Notice of Right to Sue to Pusillo on December 20, 2022. See Exhibit E. This Complaint has followed.

**MSG's Discriminatory Treatment of Plaintiff Lourdes Garcia**

77.    Plaintiff Lourdes Garcia was employed as a wardrobe dresser by Madison Square Garden Entertainment and Radio City Productions.

78.    Garcia worked for MSG-owned Radio City Productions under a collective bargaining agreement negotiated between Radio City Productions and IATSE Theatrical Wardrobe Union, Local 764.

79.    Garcia held sincere religious objections to the COVID-19 vaccine that prevented her from complying with MSG's mandate and had medical concerns that the vaccine would jeopardize her health.

80.     Garcia submitted both a religious exemption and accommodation request and a medical exemption and accommodation request.

81.     Along with her requests, she submitted a signed letter from her pastor and a signed letter from a chemical sensitivity physician.

82.     At MSG's request, Garcia also submitted an annotated HIPPA form articulating that MSG and any third-party vendors cannot have access to her private medical records.

83.     MSG never confirmed receipt of Garcia's requests and falsely claimed that Garcia never submitted her HIPPA form.

84.     Garcia made it clear that she had no intent to voluntarily resign from MSG.

85.     Garcia sent an email to James Dolan, Richard Claffey, Laine Dherty, Sandy Kapell, Pat White, Leah Okin, and Azure-Dee Martin on July 23, 2021 expressing Garcia's dismay at how MSG was treating a dedicated and long-time employee. Her correspondence was met only with a response from Ms. Martin, who informed Garcia that her employment was terminated effective immediately.

86.     Garcia was subsequently locked out of all MSG online accounts.

87.     MSG failed to engage in any interactive process with Garcia and to perform an individualized assessment to accommodate her situation.

88.     Garcia lost not only her wages, but ample benefits including health insurance, annuity contributions, pension contributions, vacation payouts, and unused sick day payouts.

89.     Garcia filed a complaint with the NYSDHR on April 15, 2022 alleging discrimination based on religion and a perceived disability.

90.     Garcia's complaint was closed by the NYSDHR on December 7, 2022.

91.     The EEOC issued a Notice of Right to Sue to Garcia on January 17, 2023. See Exhibit F. This Complaint has followed.

**MSG's Discriminatory Treatment of Plaintiff Kyle Nicholson**

92.     Plaintiff Kyle Nicholson was employed as a Stagehand by Madison Square Garden Entertainment and Radio City Productions.

93.     Nicholson submitted a religious exemption on the grounds that receiving the COVID-19 vaccine violated his conscience and sincere religious beliefs.

94.     Along with his exemption request, Nicholson submitted a self-signed affidavit articulating his religious objections to the COVID-19 vaccine. His objections were well-documented from his perspective, which is all that should be necessary to warrant a religious accommodation.

95.     Nicholson sufficiently demonstrated the basis of his religious objections to receiving an injection and that there are sincere concerns connected to his faith that preclude him from receiving the vaccine.

96.     Contrary to MSG's claim that Nicholson's request was untimely, he submitted his exemption documentation well ahead of the deadline to become fully vaccinated.

97.     Nicholson's exemption was denied on the grounds that Nicholson had failed to establish that he was qualified for an accommodation and that the accommodation would pose a direct threat and undue hardship.

98.     MSG failed to engage in the interactive process with Nicholson and to perform an individualized assessment to accommodate his particular situation.

99.     After his exemption was denied on July 12, 2021, Nicholson refused to comply with the vaccination mandate and, as a result, was terminated on the same day.

100.     Nicholson repeatedly informed MSG that he was not voluntarily resigning.

101.     Nicholson lost not only his wages, but his benefits including health insurance, annuity contributions, pension contributions, vacation payouts, and unused sick day payouts.

102.     Nicholson filed a complaint with the NYSDHR on April 15, 2022 alleging discrimination on the basis of religion and a perceived disability.

103.     Nicholson's complaint was closed for administrative convenience by the NYSDHR on December 7, 2022.

104.     The United States Equal Employment Opportunity Commission ("EEOC") issued a Notice of Right to Sue to Nicholson on January 17, 2023. *See* Exhibit G. This Complaint has followed.

**The COVID-19 Vaccine Manufacturing Process**

105.     Presently, all COVID-19 vaccines have made use either in production or testing of fetal cell lines developed from tissues derived from aborted fetuses (see excerpt below).[1]



In various stages of vaccine development and manufacturing, some of the COVID-19 vaccines used cells originally isolated from fetal tissue (often referred to as fetal cells), some of which were originally derived from an aborted fetus. The use of fetal cell lines is a very sensitive and important topic within some faith communities and among individuals with concerns about the ethics of using materials derived in this way.

---

[1] *See,* Los Angeles County Public Health, *COVID-19 Vaccine and Fetal Cell Lines*, http://publichealth.lacounty.gov/media/Coronavirus/docs/vaccine/VaccineDevelopment_FetalCellLines.pdf (last accessed August 26, 2021)

106.     For example, the Johnson & Johnson vaccines used fetal cell cultures, specifically PER.C6, a retinal cell line that was isolated from a terminated fetus in 1985.[2]

107.     In an interview with WREG-TV, Dr. Steve Threlkeld, president of the medical staff at Baptist Hospital in Memphis, Tennessee, acknowledged fetal cell lines used to produce or test the Johnson & Johnson COVID-19 vaccines "were actually recovered from an aborted fetus in the 70s or 80s and there are several of these cell lines."[3]

108.     The Louisiana Department of Health likewise confirms that the Johnson & Johnson COVID-19 vaccine used the PER.C6 fetal cell line, which "is a retinal cell line that was isolated from a terminated fetus in 1985."[4]

109.     As for the EUA-Pfizer and Moderna COVID-19 vaccines, fetal cell line HEK 293 was used during the research and development phase.[5] All HEK 293 cells are descended from tissue taken in 1973 from either an abortion or miscarriage[6] that took place in the Netherlands.[7]

---

[2] Are the vaccines made with fetal cells, Institute for Clinical Systems Improvement, https://www.icsi.org/covid-19-vaccine-faq/are-the-mrna-vaccines-made-with-fetal-cells/ (last accessed August 26, 2021), see also, Tennessee Department of Health, Fact v. Fiction: Johnson & Johnson Vaccine(2021) available at https://covid19.tn.gov/stay-informed/blogs/fact-v-fiction-johnson-johnson-vaccine/ (last visited Sept. 27, 2021) (acknowledging the Johnson & Johnson vaccine was developed from a fetal cell line).

[3] WREG, *State: Fetal cell lines, not fetal tissue, were used to make Johnson & Johnson vaccine* (March 5, 2021) available at https://www.wreg.com/news/state-fetal-cell-lines-not-fetal-tissue-was-used-to-make-johnson-johnson-vaccine/ (last visited Sept. 27, 2021).

[4] La. Dept of Public Health, *You Have Questions, We Have Answers: COVID-19 Vaccine FAQ* (Dec. 21, 2020), https://ldh.la.gov/assets/oph/Center-PHCH/Center-PH/immunizations/You_Have_Qs_COVID_19_Vaccine_FAQ.pdf (emphasis added) (last visited Oct. 24, 2022).

[5] *See*, Nebraska Medicine, *You asked, we answered: Do the COVID-19 vaccines contain aborted fetal cells?*, https://www.nebraskamed.com/COVID/you-asked-we-answered-do-the-covid-19-vaccines-contain-aborted-fetal-cells, (last visited on Aug. 26, 2021).

[6] *COVID-19 Vaccine and Fetal Cell Lines.*

[7] *Ibid.*

110.     While the production of the vaccines did not reportedly require any new

abortions, Plaintiffs object to receiving the COVID-19 vaccines on the basis that, even

assuming the vaccines do confer a meaningful health benefit, that benefit is one from ill-

gotten gains.

111.     Plaintiffs believe any benefit the COVID-19 vaccines may confer flows from the

unjust exploitation of unborn human life. On this basis alone, Plaintiffs should be entitled

on religious grounds to accept or be forced to accept the COVID-19 vaccines. This

includes the spiritual concern of an intense selfishness, of putting one's own life and well-

being ahead of the death or exploitation of another, innocent life.

**Defendant Cannot Show that Allowing Unvaccinated Employees to Stay Would Cause an Undue Hardship**

112.     MSG denied Plaintiffs' religious exemption and accommodation requests on the

grounds that granting them would pose a direct threat.

113.     The only grounds for claiming undue hardship would be the claim that

unvaccinated employees would pose a risk to their coworkers.

114.      Where (1) the COVID-19 vaccine is not effective at reducing infection; (2) the

COVID-19 vaccine is not effective at preventing transmission, (3) natural immunity to

SARS-CoV-2 is preferential to vaccine-induced immunity, and (4) the vaccine poses

abundant health risk. Plaintiffs not only poses no risk to fellow MSG employees but are

themselves put at risk from Defendants' mandate.

115.      Many spiritual, moral, or religious evaluations of medical treatment, including

with analyses promoted by for example the Catholic Pope include a weighing of the good

and the bad, at least where one may interpret in their spiritual and moral life that

something is not strictly forbidden but the person of moral concern is attempting to

discern the right path spiritually if the matter is not explicitly addressed in their religion's holy texts.  Thus, whether a vaccine works as well as originally thought may directly impact the balancing of the benefits and the moral downsides.

### The COVID-19 Vaccine Does Not Prevent Infection or Transmission

116.     The COVID-19 vaccine has been ineffective at preventing the transmission and infection of SARS-CoV-2.

117.     A study published in the European Journal of Epidemiology analyzing data from 68 countries and 2,947 counties in the United States found "no discernable relationship between percentage of population fully vaccinated and new COVID-19 cases."[8] Nor was there a significant indication of "COVID-19 case decreases with higher percentages of population fully vaccinated." Rather, they found a "marginally positive association such that countries with higher percentages of population fully vaccinated have higher COVID-19 cases per 1 million people."[9]

118.     Indeed, the vaccine has demonstrated *negative effectiveness* and could even increase the risk of infection.[10]

---

[8] S.V. Subramanian, et al., *Increases in COVID-19 are unrelated to levels of vaccination across 68 countries and 2947 counties in the United States,* European Journal of Epidemiology (September 9, 2021), available at http://doi.org/10.1007/s10654-021-00808-7.
[9] *Ibid.*
[10] Altarawneh, H., Chemaitelli, H., et al. *Effects of Previous Infection and Vaccination on Symptomatic Omicron Infections,* N. Engl. J. Med. 2022; July 7, 2022, DOI: 10.1056/NEJMoa2203965; Florentino, P., Millington, T., *Vaccine effectiveness of two-dose BNT162b2 against symptomatic and severe COVID-19 among adolescents in Brazil and Scotland over time: a test-negative case-control study,* The Lancet, August 8, 2022, DOI: https://doi.org/10.1016/S1473-3099(22)00451-0; *see* Nass, Meryl, COVID-19 Vaccines Don't Prevent Transmission, Severe Illness or Deaths, Data Show, *The Defender,* April 4, 2022, available at https://childrenshealthdefense.org/defender/covid-vaccines-dont-prevent-transmission-severe-illness-deaths-data/.

18

119.      Israeli data found that those who had received the BioNTech vaccine were 6.72 times more likely to suffer a subsequent infection than those with natural immunity.[11] Israeli data also indicates the protection BioNTech grants against infection is short-lived compared to natural immunity and degrades significantly faster.

120.      A paper published in *Eurosurveillance*, a journal published by the European Centers for Disease Control, documents a significant outbreak of COVID-19 among fully vaccinated patients and staff at a hospital in Tel Aviv.[12] At the time of the outbreak, investigators determined 238 out of 248 of exposed patients and staff had been fully vaccinated with Pfizer's mRNA vaccine. Ultimately, 39 out of the 238 exposed vaccinated people (16 percent) were infected, along with 3 out of 10 unvaccinated people - a difference that doesn't reach statistical significance because the unvaccinated group is too small. Of the infected, 23 were patients and 19 staff.[13] The staff all recovered quickly, but five patients died and another nine had severe or critical cases. ***All were vaccinated***. On the other hand, the two unvaccinated infected patients both had only ***mild*** cases of COVID-19.

---

[11] David Rosenberg, *Natural Infection vs Vaccination: Which Gives More Protection?* Israel National News, (Jul. 13, 2021), available at https://www.israelnationalnews.com/ News/News.aspx/309762 (last visited Aug. 26, 2021).
[12] Pinina Shitrit, et. al., *Nosocomial outbreak caused by the SARS-CoV-2 Delta variant in a highly vaccinated population, Israel, July 2021*, (July 2021) available at https://www.eurosurveillance.org/content/10.2807/1560-7917.ES.2021.26.39.2100822#html_fulltext (last visited on Oct. 3, 2021).
[13] *Nosocomial outbreak caused by the SARS-CoV-2 Delta variant in a highly vaccinated population, Israel, July 2021*.

121.     A senior Pfizer executive recently admitted that Pfizer did not even know whether its mRNA COVID-19 shot stopped transmission before Pfizer began administering it to the public.[14]

122.     It should, therefore, come as no surprise that in their real-world application the vaccines have not shown that they are effective at stopping infection or preventing vaccinated persons from spreading the virus.

### *Natural Immunity is Durable, Lasting, and Superior to Vaccination*

123.     Natural immunity is robust, durable, and complete against all variations of SARS-CoV-2.

124.     There is strong evidence that persons who have been infected with SARS-CoV-2 and recovered are protected from future reinfection for over a year, and potentially have lifelong immunity – unlike vaccinated persons for whom boosters are already being recommended and administered.[15] However, Defendant wholesale disregards the relevance of natural immunity entirely.

125.     A bevy of epidemiological studies demonstrate to a reasonable degree of medical certainty that natural immunity following infection and recovery from the SARS-CoV-2

---

[14] Pfizer did not know whether Covid vaccine stopped transmission before rollout, executive admits, October 13, 2022, *news.com.au*, available at https://www.news.com.au/technology/science/human-body/pfizer-did-not-know-whether-covid-vaccine-stopped-transmission-before-rollout-executive-admits/news-story/f307f28f794e173ac017a62784fec414

[15] *See*, Yair Goldberg; Micha Mandel, et al., *Protection of previous SARS-CoV-2 infection is similar to that of BNT162b2 vaccine protection: A three month nationwide experience from Israel*, medRxiv (April 20, 2021) available at https://www.medrxiv.org/content/10.1101/2021.04.20.21255670v1 (last visited on Aug. 26, 2021); *See*, also Jackson S. Turner; Wooseob Kim, et al., *SARS-CoV-2 infection induces long-lived bone marrow plasma cells in humans*, Nature 595 (pp. 421-425) (May 24, 2021).

virus provides robust and durable protection against reinfection, at levels equal to or better than the most effective vaccines currently available.[16]

126.    Israeli researchers conducting a massive group study found exceedingly low reinfection rates for people previously infected with COVID-19.[17] More interestingly, the Israeli scientists found people who receive both doses of the EUA-approved Pfizer shot were up to *13 times more likely to contract the virus than those who were previously infected with the virus* and that "natural immunity confers longer lasting and stronger protection against infection."[18]

127.    Consistent with the Israeli research team's findings, the Cleveland Clinic found similar data supporting the strong durability of natural immunity. In June of 2021, the Cleveland Clinic released a study of 1,359 previously infected health care workers. Researchers found a reinfection rate of *zero*, despite some of the studied individuals having been around COVID-positive patients more than the regular population.[19] Not one of the 1,359 previously infected subjects who remained unvaccinated, had a SARS-CoV-2 infection over the duration of the Cleveland Clinic study.[20]

---

[16] *See, e.g.* N. Kojima; A. Roshani, et al., *Incidence of Severe Acute Respiratory Syndrome Coronavirus-2 Infection among previously infected or vaccinated employees*, medRxiv (July 3, 2021) available at https://www.medrxiv.org/content/10.1101/2021.07.03.21259976v2 (last visited on Aug. 26, 2021).

[17] *See*, Svian Gazit, et. al., *Comparing SARS-CoV-2 natural immunity to vaccine-induced immunity: reinfections versus breakthrough infections*, medRxiv, https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.full.pdf (last visited on Aug. 26, 2021).

[18] *Ibid.*

[19] Nabin K. Shrestha, et. al., *Necessity of COVID-19 vaccination in previously infected individuals*, medRxiv, (June 5, 2021) available at https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v2, (last visited on August 26, 2021).

[20] *Ibid.*

128.    The Cleveland Clinic researchers concluded: "***Individuals who have had SARS-CoV-2 infection are unlikely to benefit from COVID-19 vaccination***, and vaccines can be safely prioritized to those who have not been infected before." (emphasis added).[21]

129.    Given the mounting body of compelling research, it is medically unnecessary for persons who have recovered from COVID-19 and present evidence of natural immunity, to undergo vaccination for SARS-CoV-2. Indeed, it is beneficial for most individuals to be naturally introduced to the virus.

130.    Defendant knew or should have known of this early research at the time it implemented its vaccine mandate.

131.    Forcing Plaintiffs, who may have had natural immunity, to receive the COVID-19 vaccines would not only offer them or those around them little benefit, but it would also subject them to an elevated risk of adverse side effects, including death, as demonstrated below.

***Vaccination Poses Substantial Health Risks***

132.    All three of the available COVID-19 vaccines available in the United States are marketable under Emergency Use Authorization ("EUA") and based entirely on a limited set of clinical trials executed over a matter of mere months before vaccines were administered to the public. Recent information has revealed that these trials were riddled with massive fraud, falsified data, and negligent and intentional error.

---

[21] Nabin K. Shrestha, et. al., *Necessity of COVID-19 vaccination in previously infected individuals*, medRxiv, (June 5, 2021) available at https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v2, (last visited on August 26, 2021).

133.     Though the FDA has approved the use of Comirnaty for future use, Pfizer has admitted that Comirnaty is not currently available to the public.

134.     There has never been a successful coronavirus vaccine in history, despite attempts with earlier, less well-known, coronavirus outbreaks.

135.     However, the most prevalent and first "vaccines" are not traditional vaccines. They involve in some form or another genetic manipulation of at least some parts of the human cell.  To a spiritually concerned person seeking a moral balance, the alteration of God's design and the slippery slope that it quite obviously presents (with proponents already enthusiastically pushing for all manner of other applications for techniques of changing the genetic operation of human cells, even if only in the RNA function rather than in the DNA.

136.      A traditional vaccine is relatively close to natural immunity, and thus arguably as close as one can get to God's design for the human body fighting disease. Traditionally, a de-activated or live but harmless version of the virus is injected allowing the body to react to recognize and attack the foreign body virus just as would naturally occur.  By contrast, the COVID-19 vaccines work nothing like a traditional vaccine, both introducing risks of unexpected behavior of bodily functioning we may not fully understand but also treading up redesigning God's creation.

137.      Furthermore, many people are finding that trust in parents or others, they just did not think very much about other vaccines they had been offered.  While COVID-19 may be said to be controversial, it also has caused people to stop and think about what is going on.  The fact that they had in the past acted out of comparative ignorance or lack of attention does not undermine their conclusions now.

138.    Governmental authorities revised their definition of the word "vaccine" itself in order to continue to label these experimental drugs with novel ingredients because they fail to meet the test of traditionally defined vaccines, which actually inoculated against infection and prevented transmission, neither of which COVID-19 vaccines can any longer claim credit for.

139.    Recent reporting data presents an alarming picture: as of the time of this filing, there have been 34,211 deaths reported to VAERS from COVID-19 vaccines and 1,670,376 total adverse events.[22]

140.    The input of event reports to VAERS since the COVID vaccines were rolled out is *far greater than all cumulative adverse event reports to VAERS for the prior 30 years*: an alarming statistic.

141.    This data is likely staggeringly underestimated, as past attempts to investigate VAERS reporting rate have suggested that between 1 percent and 13 percent of actual adverse effects get reported; however, because CDC changed VAERS reporting recently to include additional data, it is not possible to estimate the degree of underreporting based on past attempts to do so.[23] The CDC has failed to account for this underreporting.

---

[22] https://wonder.cdc.gov/controller/datarequest/D8;jsessionid=0E84A6725F6EA0434A7910838E0C; Josh Guetzhow, Safety Signals for COVID Vaccines Are Loud and Clear. Why Is Nobody Listening?, THE DEFENDER, (Sept. 29, 2021) available at https://childrenshealthdefense.org/defender/safety-signals-covid-vaccines-full-transparency-cdc-fda/ (last visited Oct. 2, 2021).
[23] Varricchio F, Iskander J, Destefano F, Ball R, Pless R, Braun MM, Chen RT. Understanding vaccine safety information from the Vaccine Adverse Event Reporting System. Pediatr Infect Dis J. 2004 Apr;23(4):287-94. doi: 10.1097/00006454-200404000-00002. PMID: 15071280.

142.    Recent estimates suggest that the rate of injury for vaccinated individuals is 5.1 percent.[24]

143.    COVID-19 vaccines have been known to cause a myriad of adverse effects: myocarditis, pericarditis, Guillain-Barre syndrome, antibody-dependent enhancement, fertility concerns, menstrual health issues, and many other conditions.

144.    Especially alarmingly high rates of myocarditis and pericarditis following vaccination have been witnessed in all age groups, but particularly in young males.[25] Stories of young athletes collapsing on the field due to heart problems have plagued the media. Because of underreporting, the risk of myocarditis following SARS-CoV-2 vaccination may be more serious than reported.

145.    Furthermore, spike proteins, the putative antigen induced by Pfizer-BioNTech COVID vaccine, are a toxin. They are produced and enter the circulatory system, have predictable negative consequences to vascular endothelium, activate platelets, and cross the blood brain barrier.  It would be expected to trigger the destruction of cells that produce it and present it on their surfaces.

146.    We now know that vaccine-induced spike proteins circulate throughout the body and accumulate in large concentrations in organs and tissues, including the spleen, bone

---

[24] *Horowitz: German insurance claims hint at millions of unreported COVID vaccine injuries*, August 15, 2022, available at https://www.conservativereview.com/horowitz-german-insurance-claims-vaccine-injury-2657863726.html.
[25] Krug A, Stevenson J, Høeg TB. BNT162b2 Vaccine-Associated Myo/Pericarditis in Adolescents: A Stratified Risk-Benefit Analysis. Eur J Clin Invest. 2022 May;52(5):e13759. doi: 10.1111/eci.13759. Epub 2022 Mar 4. PMID: 35156705; PMCID: PMC9111575; Gill J, Tashjian R, Autopsy Histopathologic Cardiac Findings in 2 Adolescents Following the Second COVID-19 Vaccine Dose. Arch Pathol Lab Med (2022); 146(8): 925-929. Doi: https://doi.org/10.5858/arpa.2021-0435-SA; Watanabe S, Hama R, SARS-CoV-2 vaccine and increased myocarditis mortality risk: a population based comparative study in Japan. Oct 18 2022, doi: https://doi.org/10.1101/2022.10.13.22281036.

marrow, liver, adrenal glands, and especially the ovaries.[26] Strong but not yet conclusive evidence links spike protein *in vivo* to blood clots, thrombocytopenia, hemorrhages, heart attacks and strokes.

147.    The potential adverse effects Plaintiff faces in being coerced to receive the COVID-19 vaccines pursuant to Defendant's mandate are not theoretical, hypothetical or academic—they are very real and have real victims.

148.    The empirical evidence and recent studies have provided definitive proof that these vaccines cannot boast safety and effectiveness. In no such circumstances should these experimental medical products be mandated in any setting.

149.    Given these proven facts, which were accessible at the time that MSG implemented its vaccine mandate, Defendant MSG knew or should have known that allowing Plaintiffs to continue at their positions would not pose a risk or undue burden to MSG, Radio City, or any of their employees.

**Employers Who Have Failed to Provide Reasonable Accommodations for Vaccine Mandates Have Been Held Liable**

150.    The discouragement or denial of religious accommodations from employers' mandatory vaccine policies has been found unlawful, even when those mandates were proscribed by hospitals. Indeed, numerous employers have been sued and lost over forced vaccines. *See, e.g. EEOC v. Mission Hosp. Inc*., No. 1:16-cv-118-MOC-DL, 2017 WL 3392783 (W.D.N.C. Aug. 2017) [resulting in permanent injunction against the employer from improperly denying religious exemptions from mandated vaccines and requiring

---

[26] Megan Redshaw, *'We Made a Big Mistake' – COVID Vaccine Spike Protein Travels From Injection Site, Can Cause Organ Damage,* The Defender (June 3, 2021), https://childrenshealthdefense.org/defender/covid-vaccine-spike-protein-travels-from-injection-site-organ-damage/.

employer to pay $89,000 in damages]; *United States v. Ozaukee County*, No 18-cv-343-pp (E.D. Wis. 2018) [resulting in a permanent injunction against the employer for failure to grant religious exemptions from compulsory vaccines and order payment of damages to employee].

151.     Likewise, in *EEOC v. Saint Vincent Health Center*, Civil Action No. 1:16-cv-234 (2016), the employer agreed to pay $300,000 to a class of six aggrieved former employees and provided substantial injunctive relief to settle a religious discrimination lawsuit based upon a failure to grant a religious exemption as part of a mandatory seasonal flu vaccination requirement for its employees.

152.     Moreover, in *EEOC v. Memorial Healthcare*, Civil Action No. 2:18-cv-10523 (2018), the defendant employer paid $74,418 ($34,418 in back pay, $20,000 in compensatory damages and $20,000 in punitive damages) for refusing to hire a medical transcriptionist because of her religious beliefs against receiving flu shots and refusing to accommodate those beliefs.

153.     In fact, as recently as 2018, the U.S. Equal Employment Opportunity Commission sued Nashville-based Saint Thomas Health, after the employer failed to make a reasonable religious accommodation for the flu vaccine. *EEOC v. Saint Thomas Health*, Civil Action No. 3:18-cv-00978 (M.D. Tenn. 2018).

154.     The *Saint Thomas Health* case resulted in a consent decree enjoining the employer from failing to provide religious accommodations to an employee's sincerely held religious beliefs unless such requests created an undue hardship. The decree also awarded the injured employee $75,000 in damages and directed the employer to issue the employee an apology letter.

155.    Indeed, on November 12, 2021, the U.S. Court of Appeals for the Fifth Circuit

granted a stay of the Occupational Safety and Health Administration's nationwide

vaccine mandate, stating that the mandate "raises serious constitutional concerns" and

that "a denial of the petitioners' proposed stay would do them irreparable harm," as the

Mandate threatens to substantially burden the liberty interest of reluctant individual

recipients put to a choice between their job(s) and their jab(s)." *BST Holdings v. OSHA*,

Order Granting Stay (U.S. Ct. App. 5th Cir.) (November 12, 2021). In implementing the

mandate, the 5th Circuit concluded that OSHA likely "violates the constitutional structure

that safeguards our collective liberty." *Ibid.*

### FIRST CAUSE OF ACTION
**Religious Discrimination**
**[Violation of Title VII of the Civil Rights Act of 1964; 42 U.S.C. § 2000e et seq.]**

156.    Plaintiffs hereby incorporate by reference the allegations contained in the

preceding paragraphs as if fully set forth herein.

157.    Title VII prohibits "discriminat[ion] against any individual with respect to their

compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *see

also EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768 (2015).[27]

158.    Title VII imposes upon an employer the duty to make reasonable

accommodations for the religious observances short of incurring an undue hardship.

---

[27] As the Supreme Court has recognized, employees' "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit [legal] protection." *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 714 (1981); *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). Additionally, though membership in or adherence to the tenets of an organized religion is plainly sufficient to provide protection for an individual's sincerely held religious beliefs, it is not a necessary precondition. *See Frazee v. Ill. Dep't of Emp't Sec.*, 489 U.S. 829, 834 (1989)

159.    Once an employee has established a prima facie case of discrimination, the burden shifts to the defendant to show that it could not reasonably accommodate the employee without undue hardship.

160.    Plaintiffs asserted bona fide religious beliefs that conflicted with MSG's mandatory vaccine policy and notified MSG of those beliefs by filing an exemption and accommodation request per MSG's policies.

161.    Defendant MSG utterly failed to offer any reasonable accommodation, failed to engage in the interactive process with Plaintiffs, failed to perform an individualized assessment of Plaintiffs' request, and ultimately denied Plaintiffs' religious exemption requests.

162.    Defendant MSG took adverse employment action against Plaintiffs by terminating employment.

163.    By denying reasonable accommodation and executing punitive measures against Plaintiffs, Defendants discriminated against Plaintiff due to their religious beliefs.

164.    Defendant's failure to provide religious accommodations has substantially injured Plaintiffs.

165.    On these facts, Plaintiffs established a prima facie case that shows Defendant MSG and Radio City failed to make any reasonable accommodation and violated Plaintiffs' Title VII rights.

166.    Because Plaintiffs will be able to establish a prima facie showing, the burden shifts to Defendants to show that it could not accommodate the Plaintiffs' religious needs without undue hardship. *Tepper,* at 514. Defendant is unable to make this showing for several additional reasons.

167.     First, upon receiving Plaintiffs' requests for a religious accommodation,

Defendant MSG did not give that request the individualized consideration demanded by

Title VII. In the EEOC's recent Technical Assistance, *What You Should Know About*

*COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws* (the "COVID-19

Technical Assistance", the EEOC addressed this precise issue. In the COVID-19

Technical Assistance, the EEOC posed the following question: "Under Title VII, how

should an employer respond to an employee who communicates that he . . . is unable to

be vaccinated . . . because of a sincerely held religious belief." *Id*. at K.12. The EEOC's

response was as follows:

> Once an employer is on notice that an employee's sincerely held
> religious belief, practice, or observance prevents the employee from getting
> the COVID-19 vaccine, the employer must provide a reasonable
> accommodation unless it would pose an undue hardship . . . . Under Title
> VII, an employer should thoroughly consider all possible reasonable
> accommodations . . . . In many circumstances, it may be possible to
> accommodate those seeking reasonable accommodations for their religious
> beliefs, practices, or observances.

*Id*. (emphasis added). Elsewhere in that document, the EEOC identified the types of

reasonable accommodations employers must consider when they receive requests for

religious accommodations, including "masks," "testing," "telework," "social

distancing protocols," "making changes in the work environment (such as

[modification] to ventilation systems or limiting contact with other employees and

non-employees," and "regular hand washing." *Id*. at K.5.

168.     Here, Defendants failed to "thoroughly consider all possible reasonable

accommodations," as required by the EEOC and provided a far cry from the

"individualized" assessment required by the EEOC. *Id*. at K.5.

169.    Second, Defendant MSG cannot show that affording Plaintiffs the types of accommodations the EEOC identified in the COVID-19 Technical Assistance as being reasonable in the context of employer vaccination policies—i.e., "masks," "testing," "telework," "social distancing protocols," "making changes in the work environment," "hand washing," etc.—would impose an undue hardship on it

170.    Defendants MSG and Radio City cannot show that allowing Plaintiff to continue in her position as she had been successfully doing, let alone denying alternative reasonable accommodations such as masking, would have imposed an undue hardship.

171.    Third, evidence available at the time Plaintiffs was terminated, reinforced by evidence that has come forth since, demonstrates that the COVID-19 vaccine is ineffective at preventing both infection and transmission. Declining to take the vaccine could therefore not cause any legitimate burden on MSG employees or MSG and Radio City's operation.

172.    As such, Defendants have violated Plaintiffs' rights under Title VII by discriminating against them on the basis of their religious beliefs and failing to provide reasonable accommodation.

**SECOND CAUSE OF ACTION**
**Disability Discrimination**
**[Violation of the Americans with Disabilities Act; 42 U.S.C. § 12010 et seq.]**

173.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

174.    The Americans with Disabilities Act of 1990, set forth in 42 U.S.C. §§ 12010 et seq. (hereinafter the "ADA Act") prohibits any covered entity from "discriminat[ing]

against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, compensation, job training, and other terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a).

175.    Under the ADA, an individual has a protected disability if he or she either has a "physical or mental impairment that substantially limits one or more major life activities …" (ADA Act, § 12102(1)(A)), or is: "*being regarded as having such an impairment* []." (*Id.,* at subparagraph (C)) (emphasis added).

176.    Under section 12102(3)(A) of the ADA Act: "An individual meets the requirement of 'being regarded as having such an impairment', if the individual establishes that he or she has been subjected to an action prohibited [by the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment substantially limits, or is perceived to substantially limit, a major life activity." (See also, 28 Code of Federal Regulations ("C.F.R.") §§ 35.108(f)(1) and 36.105(f)(1).)

177.    "An employer who fails to make 'reasonable accommodations to the known physical or mental limitations of an [employee] with a disability' discriminates '*unless*' the employer 'can demonstrate that the accommodation would impose an *undue hardship* on the operation of [its] business.' " *US Airways, Inc. v. Barnett,* 535 U.S. 391, 395 (2002) (quoting 42 U.S.C. § 12112(b)(5)(A)) (emphasis added). The burden of persuasion falls on the employer.

178.     An employer has a duty under the ADA to engage in an "interactive process" with the employee to determine whether, based on an *individualized assessment* of the employee's needs, a reasonable accommodation is possible.

179.     Defendants failed to engage in an interactive process with Plaintiffs and to conduct an individualized assessment of their unique circumstances.

180.     Defendants discriminated against Plaintiffs based on a perceived disability: being unvaccinated.

181.     Defendants regarded unvaccinated individuals as being "disabled" and unable to perform the duties of their employment.

182.     Based on this perceived disability, Defendants discriminated against Plaintiffs by threatening termination if they failed to receive the COVID-19 vaccine, a "condition" regarded as a disability under MSG's vaccination policy.

183.      Plaintiffs were terminated due to their COVID-19 vaccination status.

184.     By pattern and practice, virtually every employer in America has shown that reasonable accommodations and alternatives to vaccination indeed exist for employees, and these have been required all along since the inception of COVID: self-screening with temperature checks, wearing personal protective equipment (PPE), and complying with other various safety protocols until the number of COVID infections reduced to acceptable levels.

185.     Defendants cannot show that offering alternative, less-intrusive accommodations would cause an undue hardship, for the same reasons outlined in the context of Defendants' religious discrimination.

186.     Defendants' failure to provide accommodations has harmed and continues to harm Plaintiff.

187.     By failing to engage in the interactive process, offer any reasonable accommodation, and constructively terminating Plaintiffs based on their medical decision, Defendants' discriminatory actions were in violation of the ADA.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully prays for the following relief:

a.   A finding that Defendants discriminated against Plaintiffs in violation of Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act.

b.   A finding that Plaintiffs have a fundamental right to their bodily autonomy, and to make health decisions in accordance with their beliefs and conscience.

c.   Enjoin Defendants from taking any similar discriminatory adverse employment action against any other employee;

d.   An order that Plaintiffs be compensated, to the extent allowable under New Jersey state and Federal law, for his monetary damages;

e.   An order that Defendants pays Plaintiffs' costs associated with bringing this lawsuit, including their reasonable attorneys' fees and costs; and

f.   A grant of any such further relief as the Court deems necessary and proper in the public interest.

DATED: February 20, 2023

Respectfully submitted,

*/s/ Bradford L. Geyer*
Bradford L. Geyer
FormerFedsGroup.Com

34

141 I Route 130 South, Suite 303
Cinnaminson, NJ 08007
Telephone: (888) 486-3337
Email: brad@formerfedsgroup.com

Robert E. Barnes, Esq.
*Subject to admission pro hac vice*
Lexis Anderson, Esq.
*Subject to admission pro hac vice*
BARNES LAW
700 South Flower Street, Suite 1000
Los Angeles, California 90017
Telephone: (310) 510-6211
Facsimile: (310) 510-6225
Email: robertbarnes@barneslawllp.com
Email: lexisanderson@barneslawllp.com

Attorneys for Plaintiffs STEPHANIE MARRA,
DONNA HOLLAND, TEOFESTA PUSILLO,
LOURDES GARCIA, and KYLE NICHOLSON